[L.A. No. 30897. Apr. 3, 1979.]

WOODLAND HILLS RESIDENTS ASSOCIATION, INC., et al.,
Plaintiffs and Appellants, v.
CITY COUNCIL OF LOS ANGELES et al.,
Defendants and Respondents;
CONSOLIDATED RESOURCES, INC.,
Real Party in Interest and Respondent.

918

924

**COUNSEL**

Antonio Rossmann, A. James Roberts III and Tuttle & Taylor for Plaintiffs and Appellants.

Burt Pines, City Attorney, Robert Thomson and Claude E. Hilker, Assistant City Attorneys, and Jerome Montgomery, Deputy City Attorney, for Defendants and Respondents.

Axelrad, Seville & Ross and Richard H. Levin for Real Party in Interest and Respondent.

Evelle J. Younger, Attorney General, John J. Klee, Jr., and Edward P. Hill, Deputy Attorneys General, as Amici Curiae.

**OPINION**

**TOBRINER, J.**—In *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*), we concluded that California courts, exercising their inherent equitable authority, may award attorney fees

under a "private attorney general" rationale to litigants who successfully pursue "public interest" litigation vindicating important *constitutional* rights. In that decision, we expressly left open the related question "whether courts may award attorneys fees under the 'private attorney general' theory, where the litigation at hand has vindicated a public policy having a statutory, as opposed to, a constitutional basis." (20 Cal.3d at p. 47.)

At almost the same time as the rendition of our *Serrano III* decision, the Legislature enacted section 1021.5 of the Code of Civil Procedure, providing explicit statutory authority for court-awarded attorney fees under a private attorney general theory.[1] Unlike the *Serrano III* decision, however, section 1021.5 establishes the propriety of a private attorney general attorney fee award in cases beyond those vindicating constitutionally based rights. When other statutory criteria are satisfied, the section explicitly authorizes such award "in any action which has resulted in the enforcement of *an important right affecting the public interest*" (italics added) regardless of its source—constitutional, statutory or other.

The principle issue presented by the instant case involves the application of the new statute upon attorney fee rulings that were pending on appeal on January 1, 1978, the date that section 1021.5 became effective. As we shall explain, past authorities, both in California and in other jurisdictions, establish that a statute such as section 1021.5 is fully applicable to all cases pending on appeal when the statute becomes effective. The present case falls squarely within this category.

Accordingly, we have concluded that the trial court judgment, denying attorney fees, inter alia, on the premise that the private attorney general doctrine does not provide a basis for an attorney fee award in California, must be reversed and the matter remanded to the trial court for reconsideration of the attorney fee issue in light of the intervening statute. Although defendants seek to escape a remand in this case by suggesting that the present record conclusively demonstrates that plaintiffs' action does not qualify for an attorney fee award under the new statute, we have concluded that in light of the parties' conflicting characterization of the effect of the underlying litigation the trial court should appropriately

---

[1]Our decision in *Serrano III* was rendered on October 4, 1977. Section 1021.5 was signed into law by the Governor a few days earlier, on September 30, 1977. Pursuant to article IV, section 8 of the California Constitution, section 1021.5 became effective January 1, 1978.

evaluate the attorney fee question pursuant to section 1021.5 in the first instance.

1. *The facts.*

Plaintiffs, Woodland Hills Residents Association, Inc. and a number of individual members of the association, instituted the underlying mandamus action against three governmental entities of the City of Los Angeles (the city council, the planning commission, and the advisory agency), challenging the entities' approval of a subdivision map for a proposed subdivision to be located in the Woodland Hills site in Los Angeles. The proposed development covered a hillside area of 38 acres and contemplated the removal of approximately 90 feet from the top of a ridge and the filling of adjacent valleys with 750,000 cubic yards of earth to create a mesa which would hold 123 single family homes.

Plaintiffs' complaint alleged that the various agencies' approvals of the subdivision map were deficient in three principal respects: first, the complaint asserted that the approvals were invalid both because the agencies had failed to make specific findings that the subdivision in question was consistent with the applicable general plan and also because the subdivision was in fact inconsistent with the general plan; second, plaintiffs asserted that the approval was invalid because the city agencies had failed to prepare an environmental impact report prior to the approval of the subdivision map; and third, plaintiffs contended that the city had failed to fulfill a number of additional duties imposed by a variety of municipal ordinances.

Initially, the trial court rejected all of plaintiffs' contentions and entered judgment in favor of defendant city agencies, but on appeal the Court of Appeal reversed, concluding that the city agencies had erred in approving the subdivision map without making specific findings that the proposed subdivision was in fact consistent with the city's general plan. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1975) 44 Cal.App.3d 825 [118 Cal.Rptr. 856] (*Woodland Hills I*).) In reaching this conclusion, the *Woodland Hills I* court relied both on specific statutory provisions of the state Subdivision Map Act (Gov. Code, §§ 66473.5, 66474.60, subd. (c), formerly Bus. & Prof. Code, §§ 11526, subd. (c), 11526.2, subd. (c))[2] and on a then recent decision of this court, *Topanga*

---

[2]Section 66473.5 provides in full:
"No local agency shall approve a map unless the legislative body shall find that the

*Assn. For a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], in which we held that under section 1094.5 of the Code of Civil Procedure local planning agencies were obligated to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order" (11 Cal.3d at p. 515) in order both "to facilitate orderly analysis" by the local agency and to promote effective and efficient judicial review. (11 Cal.3d at p. 516.)

Finding that the earlier proceedings before the local agencies failed to provide an adequate indication that the proposed subdivision had in fact been found consistent with the applicable general plan, the *Woodland Hills I* court directed the trial court to set aside the city's approval of the subdivision map and to remand the matter to the city council so that it could proceed "in the manner required by law." (44 Cal.App.3d at p. 838.) On remand, the trial court complied with the Court of Appeal's instructions, returning the matter to the city council with the admonition that before the city could approve the proposed subdivision map it was required to "find in writing" that the proposed map was consistent with the currently applicable general plan.

Having prevailed in their mandate action, plaintiffs moved in the trial court for an award of attorney fees against the City of Los Angeles. Although at that time no statutory provision authorized an attorney fee award in such a case, plaintiffs' counsel maintained that the court, exercising its inherent equitable authority, should grant attorney fees under either a "substantial benefit" theory or a "private attorney general" theory. In support of this motion, plaintiffs' counsel alleged that the residents' association had neither the resources nor a sufficient financial stake in the litigation to enable it to pay for the substantial attorney fees necessitated by the assertedly complex litigation; as a consequence,

proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by Article 5 (commencing with Section 65300) of Chapter 3 of Division 1 of this title, or any specific plan adopted pursuant to Article 8 (commencing with Section 65450) of Chapter 3 of Division 1 of this title.

"A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses and programs specified in such a plan."

Section 66474.60 provides in relevant part:

"(a) In cities having a population of more than 2,800,000 [i.e., Los Angeles] . . .

"(c) The advisory agency, appeal board or legislative body shall not approve a tentative or final subdivision map unless it first finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with applicable general or specific plans."

counsel explained that his law firm had undertaken the association's cause on a pro bono publico basis, with the expectation that, should the association prevail, the court would award attorney fees to compensate counsel for the public service rendered to all citizens of Los Angeles in insuring that governmental agencies complied with the applicable legal strictures. Moreover, counsel claimed that as a result of the *Woodland Hills I* decision, all residents of the city in the future would be benefited because city authorities would thereafter adhere to their statutory duties and refuse to approve any subdivisions that were not specifically found consistent with the governing general plan.

The trial court rejected plaintiffs' attorney fee motion, finding with respect to the substantial benefit theory that plaintiffs "did not establish that a substantial public benefit has been conferred on [defendants] in this action," and concluding, without elaboration, that attorney fees should not be awarded to plaintiffs under the private attorney general rationale.[3]

Plaintiffs appeal from the judgment insofar as it fails to provide for an award of attorney fees to their counsel, contending that they are entitled to an attorney fee award under both the private attorney general theory and the substantial benefit theory. As we have already suggested, in light of the recent enactment of section 1021.5, specifically authorizing attorney fee awards under a private attorney general theory, we conclude that the trial court's denial of attorney fees on this theory must be reversed and the matter returned to the trial court for reconsideration pursuant to the new statute. As we shall explain, however, under the circumstances of this case we believe that the trial court properly declined to award attorney fees under the substantial benefit theory.

2. *The recently enacted provisions of section 1021.5 of the Code of Civil Procedure, authorizing awards of attorney fees under a private attorney general theory, apply to this case and to all other cases pending on appeal on the effective date of the statute.*

---

[3]The trial court's finding of fact No. 19 declares: "Petitioners did not establish that a substantial benefit has been conferred on respondents in this action. The court makes no determination in the abstract as to whether petitioners, in prevailing herein, in fact conferred substantial public benefits on respondents."

The trial court's conclusion of law No. 6 states: "Petitioners are not entitled to recover the amount of reasonable attorney's fees in trial court and on appeal, incurred in the prosecution of this action, either under the substantial benefit rule or the private attorney general rule."

As noted above, at the time the trial court denied plaintiffs' request for attorney fees under a private attorney general theory, neither statutory nor decisional authority in this state explicitly sanctioned an attorney fee award on such a basis. In *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 27 [112 Cal.Rptr. 786, 520 P.2d 10], decided a little more than a year prior to the trial court's ruling, our court briefly adverted to a number of federal decisions which had embraced the private attorney general concept as a basis for an attorney fee award, but in that decision we expressly declined to consider the doctrine's possible application in California "pending an announcement by the [United States Supreme Court] concerning its limits and contours on the federal level." (*Id.*)

In May 1975, just three months prior to the trial court's denial of plaintiff's attorney fee request, the United States Supreme Court rendered its decision in *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612], holding that, in the absence of statutory authorization, federal courts under federal law could not properly award attorney fees on a private attorney general theory. The *Alyeska* court reasoned that Congress, in providing statutory attorney fee provisions to encourage private enforcement in some circumstances, and in omitting similar provisions in other contexts, had made an implicit legislative determination as to which statutory policies warranted such encouragement; the majority in *Alyeska* concluded that under these circumstances the judiciary would be improperly intruding into the legislative domain if courts were to determine which of the many statutory remedies that lacked explicit attorney fee provisions should be supplemented by an attorney fee award. (421 U.S. at pp. 260-269 [44 L.Ed.2d at pp. 154-160].)

In light of *D'Amico* and *Alyeska*, and in the absence of any subsequent California judicial pronouncement or statutory enactment, the trial court in the instant case concluded that plaintiffs were not entitled to an attorney fee award on a private attorney general theory.

Subsequent to the trial court's ruling, and while the present case was pending on appeal, the question whether California courts enjoy inherent equitable authority to award attorney fees pursuant to a private attorney general theory came before our court in *Serrano III*. In *Serrano III*, the trial court, relying on the private attorney general rationale, had entered an order against various state officials awarding substantial legal fees ($800,000) to two public interest law firms that had successfully prosecut-

ed the landmark *Serrano* litigation.[4] The state officials appealed the attorney fee award, urging our court to adopt the *Alyeska* conclusion and thereby reject in its entirety the private attorney general theory as a basis for a nonstatutory award of attorney fees.

In *Serrano III*, however, we declined to follow the *Alyeska* court's broad holding and concluded that, under the facts of that case, the trial court had properly exercised its equitable authority in awarding attorney fees on a private attorney general theory. In reaching that conclusion, we pointed out that the principal concern of the *Alyeska* court—i.e., that the application of the private attorney general doctrine would improperly thrust the judiciary into "picking and choosing," without legislative warrant, which statutes should be supplemented by an attorney fee award and which should not—was not present in the *Serrano* litigation for in that case the plaintiffs had not vindicated a public policy grounded in statute, "but one grounded in the *state Constitution.*" (Original italics.) (20 Cal.3d at p. 46.) In light of the constitutional nature of the rights at issue in *Serrano,* we reasoned that the absence of an explicit statutory attorney fee provision could not realistically be viewed as a legislative determination that the enforcement of such rights did not warrant the encouragement provided by the availability of an attorney fee award. (20 Cal.3d at pp. 46-47.)

Thus, we concluded in *Serrano III* that when a litigant has successfully vindicated a right of constitutional dimension and has provided benefits to a large group of persons under circumstances in which subsidization of attorney fees is necessary if enforcement of the right is to be achieved, a trial court in California possesses inherent equitable power to award attorney fees on a private attorney general theory. (20 Cal.3d at p. 47.) In so holding, we expressly left open the question whether the inherent equitable authority enjoyed by California courts is sufficiently expansive that "courts may award attorney fees under the 'private attorney general' theory, where the litigation at hand has vindicated a public policy having a statutory, as opposed to, a constitutional basis." (*Id.*)

We need not reach the question of the scope of the judiciary's nonstatutory equitable authority in the instant case, however, because, as already noted, while the present case was pending on appeal the Legislature enacted section 1021.5 of the Code of Civil Procedure. The

[4]See *Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*); *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*).

section provides explicit statutory authorization for a "private attorney general" attorney fee award without regard to whether the public policy vindicated rests upon Constitution or statute. Although section 1021.5 was not on the books at the time the trial court denied plaintiffs' motion for attorney fees, the governing authorities establish that the new statute nonetheless applies to this proceeding, which was pending on appeal at the time the legislative enactment became effective.

*Bradley* v. *Richmond School Board* (1974) 416 U.S. 696 [40 L.Ed.2d 476, 94 S.Ct. 2006] is perhaps the leading case on point. In *Bradley,* a school desegregation case, no statutory provision authorized an award of attorney fees at the time the trial court ruled on plaintiffs' motion therefor, but the trial court nonetheless concluded that plaintiffs deserved such fees on nonstatutory grounds. While the attorney fee ruling was pending before the Fourth Circuit Court of Appeals, Congress enacted a new statute specifically authorizing awards for attorney fees in school desegregation cases. (20 U.S.C. § 1617.) Despite the recent statutory enactment, the Fourth Circuit reversed the award, concluding that the new statute applied only to legal services rendered after the effective date of the statute and that, in the absence of explicit statutory authorization, the trial court had erred in awarding attorney fees.

The United States Supreme Court, however, reversed the Fourth Circuit's decision, concluding that the newly enacted attorney fee provision should be applied to all attorney fee rulings pending on appeal at the time the new statute became effective. The court anchored its "holding . . . on the principle that a court is to apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." (416 U.S. at p. 711 [40 L.Ed.2d at p. 488].) The high tribunal concluded that the recently adopted attorney fee statute, though enacted after the attorney fees in question had been incurred and subsequent to the trial court's order, applied because the attorney fee order was pending on appeal when the statute took effect. Accordingly, the *Bradley* court remanded the case to the trial court with directions to apply the intervening statute.

Subsequent to *Bradley,* numerous federal courts have followed *Bradley*'s reasoning in concluding that a variety of newly enacted attorney fee provisions should be applied to attorney fee rulings pending on appeal on the effective date of the statutes. (See, e.g., *Gore* v. *Turner* (5th Cir. 1977)

563 F.2d 159, 163 [applying 42 U.S.C. § 1988]; *Alphin* v. *Henson* (4th Cir. 1977) 552 F.2d 1033, 1034 [15 U.S.C. § 26]; *Torres* v. *Sachs* (2d Cir. 1976) 538 F.2d 10, 12-13 [42 U.S.C. § 1973*l*(e)].)

The California decisions are in accord with the governing federal rule. In *Olson* v. *Hickman* (1972) 25 Cal.App.3d 920 [102 Cal.Rptr. 248], while an administrative mandamus action was pending on appeal the Legislature enacted section 800 of the Government Code, authorizing an award of attorney fees in such a proceeding when the administrative action resulted from "arbitrary or capricious action or conduct by a public entity or an officer thereof." The defendant county claimed that the statute should not be applied "retroactively" to permit an attorney fee award in that case, but the Court of Appeal concluded that the statute should appropriately be applied to actions in which the appeal had not been finally determined when the statute became effective. Most recently, in *Kievlan* v. *Dahlberg Electronics* (1978) 78 Cal.App.3d 951, 959 [144 Cal.Rptr. 585], the Court of Appeal, relying on the *Olson* decision, specifically concluded that section 1021.5 of the Code of Civil Procedure, the private attorney general provision at issue in this case, should be applied to cases pending on appeal on the effective date of the statute. The *Kievlan* court remanded the case to the trial court, with directions to consider plaintiffs' attorney fee motion under the provisions of the new statute.

Thus, under this established line of authority, section 1021.5 applies to the instant case.

 3. *Contrary to defendants' contentions, the present record does not establish that plaintiffs are not entitled to an attorney fee award under section 1021.5, and thus the case must be remanded to the trial court to permit it to evaluate plaintiffs' motion in light of the governing statutory criteria.*

As we have seen, the trial court's denial of plaintiffs' motion for attorney fees rested in part upon the now clearly erroneous premise that attorney fees may never be granted in California on the basis of a private attorney general theory. Although this fundamental defect would ordinarily require a reversal of the judgment and a remand for a determination of plaintiffs' motion under the proper governing principle, defendants contend that reversal is unnecessary here because, in their view, the present record conclusively demonstrates that plaintiffs are not entitled to

attorney fees under the provisions of section 1021.5. As we explain, we disagree with defendants' contention and conclude that the trial court should determine the propriety of attorney fees under section 1021.5 after a hearing which properly focuses on the criteria established by that statute.

■ As defendants concede, the Legislature adopted section 1021.5 as a codification of the "private attorney general" attorney fee doctrine that had been developed in numerous prior judicial decisions. As we explained in *Serrano III*, the fundamental objective of the private attorney general doctrine of attorney fees is " 'to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.' " (20 Cal.3d at p. 43 (quoting *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, 27).) The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. (See, e.g., *Newman* v. *Piggie Park Enterprises, Inc.* (1968) 390 U.S. 400, 401-402 [19 L.Ed.2d 1263, 1265, 88 S.Ct. 964]. See generally Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation* (1975) 88 Harv.L.Rev. 849, 888-907 [hereafter Dawson, *Public Interest Litigation*]; Nussbaum, *Attorney's Fees in Public Interest Litigation* (1973) 48 N.Y.U.L.Rev. 301; Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts* (1974) 122 U.Pa.L.Rev. 636, 655-681 [hereafter Comment, *Equal Access*]; Note, *Awarding Attorneys' Fees to the "Private Attorney General": Judicial Green Light to Private Litigation in the Public Interest* (1973) 24 Hastings L.J. 733, 755-758.)

In *Serrano III* we noted that in the numerous pre-*Alyeska* federal decisions that had applied the private attorney general doctrine in awarding attorney fees, "various formulations of the [private attorney general] rule have appeared. In spite of variations in emphasis, all of these formulations seem to suggest that there are three basic factors to be considered in awarding fees on this theory. These are in general: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [and] (3) the number of people

standing to benefit from the decision. [Citation.]" (20 Cal.3d at pp. 44-45.)

Four days before our court issued the *Serrano III* decision, the Governor signed section 1021.5 into law. Section 1021.5 provides, in language directly parallel to the passage from *Serrano III* quoted above, that: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, the section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

The similarity of the criteria enumerated in *Serrano III* and in section 1021.5 is by no means coincidental. It is clear from both the statutory framework and language that in drafting section 1021.5 the Legislature relied heavily on the pre-*Alyeska* federal private attorney general authorities adverted to in *Serrano III*; indeed, we do not doubt that in significant measure the legislation was an explicit reaction to the United States Supreme Court's *Alyeska* decision. The statute reflected a legislative declaration that, in California, courts do enjoy the authority—exercised in numerous pre-*Alyeska* federal decisions—to award attorney fees on a private attorney general theory. ■ Because in framing the provisions of section 1021.5 the Legislature drew heavily upon the pre-*Alyeska* federal decisions, we believe that such authorities—while no longer viable in the federal realm—will often be helpful and reliable guides in interpreting the various provisions of the California statutes.[5]

■ Defendants contend that the inapplicability of section 1021.5 is so clear in this case that we need not even afford plaintiffs an opportunity to obtain a trial court ruling on their attorney fee motion under the current governing standard. In assessing that contention in terms of the

---

[5]Many of the pre-*Alyeska* federal decisions are cited and analyzed in a number of scholarly law review articles. (See, e.g., Dawson: *Public Interest Litigation, supra,* 88 Harv.L.Rev. 849, 898-901; Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 666-674; Nussbaum, *Attorney's Fees in Public Interest Litigation, supra,* 48 N.Y.U.L.Rev. 301, 321-331.)

statutory criteria, we must consider whether: (1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." Inasmuch as plaintiffs' action has produced no monetary recovery, factor "(c)" of section 1021.5 is not applicable.

### (1) "Important right"

Although section 1021.5 provides no concrete standard or test against which a court may determine whether the right vindicated in a particular case is sufficiently "important" to justify a private attorney general fee award, the statutory language and the pertinent federal authorities provide at least some guidance in this area. ■ First, as we have already suggested, the broad statutory language and the federal precedents indicate that a right need not be constitutional in nature to justify the application of the private attorney general doctrine; the federal cases have applied the doctrine to the vindication of both constitutional[6] and statutory[7] rights.

Second, the Legislature obviously intended that there be some selectivity, on a qualitative basis, in the award of attorney fees under the statute, for section 1021.5 specifically alludes to litigation which vindicates "important" rights and does not encompass the enforcement of "any" or "all" statutory rights. Thus, again like the federal cases, the statute directs the judiciary to exercise judgment in attempting to ascertain the "strength" or "societal importance" of the right involved.

■ Of course, "important rights" are not necessarily confined to any one subject or field. As the variety of federal cases attests, the private

---

[6]See, e.g., *Sims* v. *Amos* (M.D.Ala.) 340 F.Supp. 691, affd. (1972) 409 U.S. 942 [34 L.Ed.2d 215, 93 S.Ct. 290] (legis. reapportionment); *Knight* v. *Auciello* (1st Cir. 1972) 453 F.2d 852 (racial discrimination in public housing); *Taylor* v. *Perini* (6th Cir. 1974) 503 F.2d 899, vacated 421 U.S. 982 [44 L.Ed.2d 474, 95 S.Ct. 1985] (inhuman conditions of detention in state prison).

[7]See, e.g., *La Raza Unida* v. *Volpe* (N.D.Cal. 1972) 57 F.R.D. 94, affd. (9th Cir. 1973) 488 F.2d 559, cert. den. (1973) 417 U.S. 968 [41 L.Ed.2d 1138, 94 S.Ct. 3171] (statutory right of hearing before freeway eliminates public parkland; statutory right of relocation for displaced residents); *Wilderness Society* v. *Morton* (D.C.Cir. 1974) 495 F.2d 1026, revd. *sub nom., Alyeska Pipeline Co.* v. *Wilderness Society, supra,* 421 U.S. 240 (statutory protection of environment).

attorney doctrine may find proper application in litigation involving, for example, racial discrimination,[8] the rights of mental patients,[9] legislative reapportionment[10] and, most significantly for the instant case, environmental protection.[11] In litigation concerning the application of statutorily based rights in these various fields, past decisions suggest that in determining the "importance" of the particular "vindicated" right, courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals. (See, e.g., *La Raza Unida* v. *Volpe, supra,* 57 F.R.D. 94, 99.)

■ In the instant case, plaintiffs maintain that the "important right" which they have vindicated through this litigation is the basic principle that a subdivision may not be approved by a municipality if it is inconsistent with the locality's governing general plan. ■ As plaintiffs suggest, the legislative history of the Subdivision Map Act illuminates the Legislature's acute awareness that approval of subdivisions which are inconsistent with a locality's general plan "subverts the integrity . . . of the local planning process." (Subcommittee on Premature Subdivisions, Staff Recommendations for Legislative Action (Jan. 15, 1971) p. 4.) To preserve the integrity of the "general plan" concept, the Legislature enacted Government Code sections 66473.5 and 66474.60, subd. (c) (quoted in fn. 2, *ante*), mandating that a subdivision map may not be approved unless the appropriate agencies first find that the subdivision is consistent with the applicable general plan. ■ Plaintiffs argue, with much force, that once a general plan has been formulated, the public has an overriding interest in the faithful enforcement of the guidelines established by the plan as applied to proposed subdivisions. (Cf. *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 651-653 [150 Cal.Rptr. 242, 586 P.2d 556]; *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774, 782 [42 Cal.Rptr. 283].)

Although defendants do not challenge plaintiffs' claim that the enforcement of the public's right to conforming subdivisions constitutes an "important right" within the meaning of section 1021.5, they do

[8]See, e.g., *Lee* v. *Southern Home Sites Corp.* (5th Cir. 1971) 444 F.2d 143; *Fowler* v. *Schwarzwalder* (8th Cir. 1974) 498 F.2d 143.

[9]See, e.g., *Wyatt* v. *Stickney* (M.D.Ala. 1972) 344 F.Supp. 387, affirmed in part *sub nom. Wyatt* v. *Aderholt* (5th Cir. 1974) 503 F.2d 1305.

[10]See, e.g., *Sims* v. *Amos, supra,* 340 F.Supp. 691; *Yelverton* v. *Driggers* (M.D.Ala. 1974) 370 F.Supp. 612, 620-621.

[11]See, e.g., *La Raza Unida* v. *Volpe, supra,* 57 F.R.D. 94; *Wilderness Society* v. *Morton, supra,* 495 F.2d 1026.

contest plaintiffs' assertion that the instant litigation vindicated any such right. Defendants emphasize, in this regard, that while plaintiffs' complaint asserted, inter alia, that the subdivision in fact conflicted with the general plan, the Court of Appeal in the *Woodland Hills I* decision did not find it necessary to resolve that issue, but instead set aside the approval of the subdivision simply because the pertinent city authorities had failed to make specific findings as to the consistency of the subdivision with the general plan. Defendants contend that the only "right" vindicated by the litigation is the statutory requirement mandating specific findings (Code Civ. Proc., § 1094.5; see *Topanga Assn. For a Scenic Community, supra,* 11 Cal.3d 506), and that in this context such statutory right constitutes merely a "technical" requirement and does not rise to the level of an "important right" for purposes of section 1021.5.

In arguing that the "right" vindicated by plaintiffs' litigation must necessarily be determined by the narrow holding of the Court of Appeal opinion in *Woodland Hills I,* defendants raise an issue that is endemic to the application of numerous statutory attorney fee provisions. A similar question, for example, arose in the recent case of *White* v. *Beal* (E.D.Pa. 1978) 447 F.Supp. 788. In *White,* plaintiffs' suit challenged the validity of a Pennsylvania statute on two grounds: (1) as a denial of equal protection and (2) as in conflict with a provision of the federal Social Security Act and invalid under the supremacy clause. After the court granted plaintiffs summary judgment on the basis of the Social Security Act claim, plaintiffs moved for an attorney fee award under the Civil Rights Attorney Fee's Award Act; defendants argued in response that no award was appropriate under the statutory civil rights provision because the plaintiff's equal protection claim had never been finally adjudicated.

The *White* court rejected defendants' contention, observing, inter alia, that "a denial of attorneys' fees on the basis that the constitutional claim was not adjudicated . . . would only serve to thwart both the judicial policy against unnecessarily deciding issues of constitutional dimension and the purpose for which the Act was passed." (447 F.Supp. at p. 794.) Finding that plaintiffs' constitutional claim was not "insubstantial" and that the statutory and constitutional claims "arose out of a common nucleus of operative fact" (*id.,* at pp. 793-794), the court held that under the circumstances of that case attorney fees should be awarded under the Civil Rights Attorney Fee's Award Act. In recent years, a number of additional federal authorities have similarly indicated the propriety of awarding attorney fees under comparable circumstances. (See, e.g.,

*Kimbrough* v. *Arkansas Activities Assn.* (8th Cir. 1978) 574 F.2d 423, 426-427; *Southeast Legal Defense Group* v. *Adams* (D.Ore. 1977) 436 F.Supp. 891; *Lund* v. *Affleck* (D.R.I. 1977) 442 F.Supp. 1109, 1112-1114.)

As these federal decisions teach, the fact that a plaintiff is able to win his case on a "preliminary" issue, thereby obviating the adjudication of a theoretically more "important" right, should not necessarily foreclose the plaintiff from obtaining attorney fees under a statutory provision. When a defendant's action is invalid on a number of grounds, it would be both unfair and contrary to the legislative purpose of section 1021.5 to deprive a plaintiff of attorney fees simply because the court decides the case in plaintiff's favor on a "simpler" or less "important" theory. (Cf. *Wilderness Society* v. *Morton, supra,* 495 F.2d 1026, 1034-1035; *Sierra Club* v. *Lynn* (W.D.Tex. 1973) 364 F.Supp. 834, 847, revd. in part (5th Cir. 1974) 502 F.2d 43.) On the other hand, of course, the fact that a plaintiff prevails on a "technical" preliminary issue does not necessarily demonstrate that his additional claims have sufficient merit to warrant the conclusion that the action served to vindicate an important right.

Under such circumstances, the trial court, utilizing its traditional equitable discretion (now codified in § 1021.5), must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award under a private attorney general theory.

In the instant case, the trial court never undertook such an inquiry because section 1021.5 did not exist at the time it ruled on plaintiffs' attorney fee motion. Although defendants claim that plaintiffs' success in this case rested simply on "technical" grounds, the *Woodland Hills I* court's detailed discussion of the various administrative proceedings in this case (44 Cal.App.3d at pp. 834-838) indicates, at the very least, that the court confronted substantial questions as to the consistency of the proposed subdivision and Los Angeles' currently applicable general plan. Under these circumstances, we believe that the trial court should determine in the first instance, from a realistic perspective, whether or not the litigation has "resulted in the enforcement of an important right affecting the public interest" within the meaning of section 1021.5.

## (2) "Significant benefit"

Defendants contend alternatively that the denial of attorney fees can be upheld without remand on the ground that plaintiffs' litigation did not confer a "significant benefit . . . on the general public or a large class of persons" as required by section 1021.5. Again, although the statute does not define with precision the nature of the "benefit" that is contemplated by the provision, the statutory language and prior authorities afford some guidance on the issue. ▇ First, the explicit terms of the statute provide that the "significant benefit" conferred by the litigation may be either "pecuniary or nonpecuniary" in nature; thus, the fact that the chief benefits afforded by an action have no readily ascertainable economic or monetary value in no way forecloses an attorney fee award under the statute. This language recognizes that in many cases the important gains or contributions rendered by public interest litigation will be reflected in nonmonetary advances.

Second, as our *Serrano III* explains, under the *private attorney general doctrine,* unlike the substantial benefit doctrine discussed below, the "significant benefit" that will justify an attorney fee award need not represent a "tangible" asset or a "concrete" gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy. (20 Cal.3d at p. 42.) In *Serrano III* itself, for example, our court recognized the propriety of an attorney fee award under the private attorney general doctrine simply because of the magnitude and significance of the fundamental constitutional principles involved in that litigation and the benefit that flowed to the general public in having such principles enforced. We concluded that the absence of any guarantee of a "concrete benefit" resulting from the litigation constituted no insurmountable obstacle to an attorney fee award on a private attorney general theory.

Of course, the public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a "benefit" when illegal private or public conduct is rectified. Both the statutory language (*"significant* benefit") and prior case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation. We believe rather that the Legislature contemplated that in adjudicating a motion for attorney fees under section 1021.5, a trial court would determine the significance of the benefit, as well as the size of the class

receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case. (See, e.g., *La Raza Unida* v. *Volpe, supra,* 57 F.R.D. 94, 99-100.)

▆▆ Defendants appear to suggest that under such a realistic assessment plaintiffs' attorney fee request must fail in this case because, in defendants' view, the benefits from this litigation were not significant but rather were confined to a small group of homeowners who live in the immediate vicinity of the proposed subdivision. Plaintiffs vigorously contest defendants' "belittling" of the benefits conferred by the litigation, arguing (1) that in light of the unique aesthetics of the existing terrain and the nature of the proposed subdivision, all residents of the city were "significantly benefited" by the litigation's success in requiring the particular project to conform with the general plan and (2) that the litigation provided an additional, and in some respects more significant benefit, by compelling the city to abandon its alleged prior practice of general noncompliance with the Subdivision Map Act.

In connection with this latter assertion, plaintiffs maintain that, as a direct result of the litigation, the residents of all neighborhoods of the city can be assured that when subdivisions are proposed in their vicinity in the future, the city will withhold approval if the subdivision conflicts with the general plan. In support of their claim, plaintiffs rely on a number of federal decisions which, in awarding fees on a private attorney general theory, have pointed out that the particular litigation benefited large numbers of people by successfully compelling the alteration of a widespread illegal governmental practice. (See, e.g., *Wilderness Society* v. *Morton, supra,* 495 F.2d 1026, 1032-1034; *Callahan* v. *Wallace* (5th Cir. 1972) 466 F.2d 59, 62; *NAACP* v. *Allen* (M.D.Ala. 1972) 340 F.Supp. 703, 705, 709, affd. (5th Cir. 1974) 493 F.2d 614.)

▆▆ ▆▆▆ Once again, because section 1021.5 was not yet on the books, the trial court did not pass on these conflicting claims to determine whether, in realistic terms, the action at bar conferred a "significant benefit on the general public or a large class of persons,"[12] and contrary

---

[12]As discussed below, in denying plaintiffs' request for attorney fees under the "substantial benefit" doctrine, the trial court did find that plaintiffs had not established "that a substantial benefit has been conferred on respondents in this action." This finding, however, is not the equivalent of a finding against plaintiff under section 1021 subdivision (a) for two reasons: first, as explained below, the concept of "benefit" under the private attorney general doctrine is not identical to that under the "substantial benefit" doctrine, and second, under section 1021.5, the "significant benefit" need not be conferred on the

to defendant's argument, we do not believe that this court is in a position to decide the question in the first instance. On remand, we believe both parties should be given an opportunity to present evidence in support of their claims, and the trial court should resolve the issue on the basis of such showing.

### (3) "Necessity and financial burden of private enforcement"

The final factor affecting plaintiffs' attorney fee request under section 1021.5 is whether "the necessity and financial burden of private enforcement are such as to make the award appropriate." Inasmuch as the present action proceeded against the only governmental agencies that bear responsibility for the subdivision approval process, the necessity of private, as compared to public, enforcement becomes clear. (See, e.g., *La Raza Unida* v. *Volpe, supra,* 57 F.R.D. 94, 101; Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 671.)

It is unclear from the present record, however, whether "the financial burden of private enforcement" in this case is such as to make an attorney fee award appropriate under the private attorney general theory. ▮▮▮ As the Court of Appeal recently explained in *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]"

▮▮▮ In connection with their claim that the benefits of this litigation are confined to a small group of neighboring homeowners, defendants contend that the plaintiffs' victory in the underlying suit did not "transcend [their] personal interest" and that the litigation expenses did not place a disproportionate burden on plaintiffs. Plaintiffs directly challenge these claims, pointing out that in defense of their attorney fee motion they introduced evidence to demonstrate that their fiscal resources are minimal, that their personal financial interest in the present action is small and that the litigation expenses entailed in actions of this type are considerable. The trial court made no findings on these issues.

---

opposing party respondents to justify an attorney fee award, but need only be conferred on the general public or a large class of persons.

Once again, we conclude that on remand, the parties should be permitted to introduce evidence on these matters, so that the trial court may determine whether the financial burden in this case is such that an attorney fee award is appropriate in order to assure the effectuation of an important public policy.

■ A question has also arisen as to the propriety of an "apportionment" of attorney fees under section 1021.5. Although section 1021.5 does not specifically address the question of the propriety of a partial award of attorney fees, we believe that if the trial court concludes that plaintiffs' potential financial gain in this case is such as to warrant placing upon them a portion of the attorney fee burden, the section's broad language and the theory underlying the private attorney general concept would permit the court to shift only an appropriate portion of the fees to the losing party or parties. (Cf. Note, *Awarding Attorneys' Fees to the "Private Attorney General": Judicial Green Light to Private Litigation in the Public Interest* (1973) 24 Hastings L.J. 733, 761.)[13]

Thus, in sum, we conclude that the portion of the judgment denying plaintiffs' motion for attorney fees must be reversed and the case must be remanded to the trial court so that it may pass on the motion pursuant to the provisions of section 1021.5.

■ *4. Under the circumstances of this case, plaintiffs' entitlement to attorney fees should be determined under the provisions of section 1021.5, rather than the substantial benefit doctrine.*

Plaintiffs contend that in addition to remanding this case for reconsideration under the new private attorney general statute, our court should also direct the trial court to award attorney fees to plaintiffs under the so-called "substantial benefit" theory, one of the nonstatutory equitable doctrines that California courts have utilized in the past as a basis for attorney fee awards. Although we agree with plaintiffs' contention that the trial court's denial of fees under this theory may have been based in part upon a misconception of one aspect of the doctrine, as we shall explain we have nonetheless concluded that under the circumstances of

[13]For example, if the trial court finds that plaintiffs' potential benefit was such that individuals in their position could reasonably have been expected to incur attorney fees if the amount of the fee bore a more reasonable relation to such benefit, the trial court, in awarding fees under section 1021.5, may deduct from the total reasonable attorney fee an amount reflecting the fee that plaintiffs could reasonably have been expected to bear themselves.

this case the court did not err in declining to award fees under the substantial benefit doctrine. In light of the nature of the benefits bestowed on the public by this litigation, we believe plaintiffs' entitlement to attorney fees should properly stand or fall on the basis of the private attorney general concept, rather than on the substantial benefit theory.

In *Serrano III,* we explained that the substantial benefit theory "which may be viewed as an outgrowth of the 'common fund' doctrine, permits the award of fees when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a 'substantial benefit' of a pecuniary or nonpecuniary nature. In such circumstances, the court, in the exercise of its equitable discretion, thereupon may decree that under dictates of justice those receiving the benefit should contribute to the costs of its production." (20 Cal.3d at p. 38.) ▉ Unlike the private attorney general concept, which, as we have seen, is intended to promote the vindication of important rights affecting the public interest, the "substantial benefit" doctrine—like the "common fund" doctrine from which it emerged—rests on the principle that those who have been "unjustly enriched" at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained.

▉ Because of the disparity in the purposes underlying the private attorney general and substantial benefit doctrines, the doctrines differ in a number of subtle but important respects. In the first place, whereas the private attorney general doctrine as embodied in section 1021.5 (and most comparable statutory provisions) provides for the shifting of attorney fees from plaintiffs to "one or more opposing parties," the substantial benefit doctrine does not contemplate that the losing party or parties should ultimately bear attorney fees but rather mandates that *"those receiving the benefits* should contribute to the costs of its production." (Italics added.) (*Serrano III, supra,* 20 Cal.3d at p. 38.) In some circumstances, however, this difference may be more theoretical than real, for frequently one or more of the "opposing" or "losing" parties will either represent or act on behalf of the benefited class, so that an attorney fee award entered against such a party will, as a practical matter, "operate to spread the costs proportionately among [the benefited class]." (*Mills* v. *Electric Auto-Lite* (1970) 396 U.S. 375, 393-394 [24 L.Ed.2d 593, 607, 90 S.Ct. 616].)

▉ Plaintiffs contend that this proposition applies to the instant case in that the City of Los Angeles, the party that will ultimately bear an

attorney fee award entered against defendants, clearly is an appropriate party to spread the costs among the general city populace, the class which plaintiffs assert is the principal beneficiary of this litigation. Plaintiffs maintain that the trial court failed to appreciate the fee-spreading capability of the city and argue that the court's findings reveal that that court proceeded upon the erroneous assumption that the substantial benefit doctrine could be employed to shift fees to a defendant only where the litigation has conferred a benefit *upon such defendant.*

We recognize that the trial court's finding is somewhat ambiguous in this regard.[14] To the extent that the trial court proceeded upon the assumption that an award under the substantial benefit theory is appropriate only when the defendant against whom the fees are awarded has itself directly benefited from the litigation, we agree with plaintiffs that such reasoning is erroneous. ▮▮▮ Although some language in our earlier *D'Amico* decision may possibly have misled the trial court (see 11 Cal.3d at p. 25), we made it clear in *Serrano III* that an award of fees under the substantial benefit doctrine "does not depend upon substantial benefits to the *defendant* . . . . [T]he proper rule . . . 'permit[s] reimbursement [of attorneys fees] in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' [Citations.]" (20 Cal.3d at p. 40, fn. 10.)

▮▮▮ Nonetheless, although the fact that defendant agencies themselves may not have directly benefited from the litigation is not a sufficient reason for denying attorney fees under the substantial benefit theory, we believe the trial court's decision to deny fees on this basis was proper on another ground. In *Serrano III,* we recognized that "plaintiffs and their attorneys, as a result of the *Serrano* litigation, have rendered an enormous service to the state and all of its citizens by insuring that the state educational financing system shall be brought into conformity with the equal protection provisions of our state Constitution so that the degree of educational opportunity available to the school children of this state will no longer be dependent upon the taxable wealth of the district in which each student lives." (*Id.*) We nonetheless concluded, however, that benefits of this nature—deriving from "the effectuation of constitu-

[14]As noted at footnote 3, *ante,* the court's finding states simply that "[p]etitioners did not establish that a substantial benefit has been conferred on respondents in this action" and does not specify whether "respondents" was intended to refer only to the specific defendant agencies or to the city populace as a whole.

tional or statutory policy, without more" (*id.*)—would not provide a proper basis for an attorney fee award under the substantial benefit theory, but rather constituted the type of benefit to which the private attorney general doctrine was directed.

The justification for distinguishing between the types of benefits encompassed by the substantial benefit and private attorney general concepts lies in the distinct purposes of the two doctrines. ■ As we have seen, the substantial benefit doctrine rests on the principle of preventing *unjust* enrichment. That principle has its clearest application in instances in which one individual's action has created or preserved a substantial "common fund" or has obtained a decision providing substantial pecuniary benefits to other persons; in such a case, courts can reasonably conclude that although an award of attorney fees payable out of the "fund" will render the benefited parties "involuntary clients" of the attorneys, equitable considerations justify charging those who have obtained an economic windfall with the costs of obtaining such benefits. So long as the costs bear a reasonable relation to the benefits, the "involuntary client" who retains a substantial gain from the litigation will generally have no just cause to complain. (See generally Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds* (1974) 87 Harv.L.Rev. 1597.)

When the "benefits" bestowed on others become less tangible and more ephemeral in nature, however, the equity in charging involuntary beneficiaries with the costs of obtaining such benefits on an unjust enrichment theory becomes more problematical. Although the named plaintiffs and others in the benefited class may place a high value on such intangible benefits, and thus may be more than willing to pay their share of the costs of procuring such benefits, other members of the benefited class may value such benefits differently, and may legitimately complain that they should not be involuntarily saddled with costs which are out-of-proportion to their perceived benefit. In such circumstances, insofar as an award of attorney fees is sought to be justified on notions of unjust enrichment, the justification fails.

This is not to say, however, that the substantial benefit theory is only applicable in instances in which pecuniary benefits have been conferred by the litigation. Although most of the California cases which have invoked this theory have in fact involved such pecuniary benefits (see, e.g., *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81

Cal.Rptr. 683]; *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596 [127 Cal.Rptr. 244]; *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570 [131 Cal.Rptr. 153]), there have been instances in which litigation has produced nonpecuniary benefits of such a concrete and clearly substantial value that equitable considerations have suggested the injustice in permitting others to obtain such benefits without contributing to their cost. (See, e.g., *Fletcher* v. *A. J. Industries* (1968) 266 Cal.App.2d 313, 324-325 [72 Cal.Rptr. 146].)

In the instant case, plaintiffs suggest that the present action has conferred upon the general public, and in particular upon the residents of Los Angeles, a number of such benefits, benefits which, while nonpecuniary in nature, are nevertheless sufficiently "concrete and actual" to justify an attorney fee award under the substantial benefit doctrine as elaborated in *Serrano III*. Initially, plaintiffs contend that all of the residents of Los Angeles have received the benefit of the important *principle of law* resolved in *Woodland Hills I,* namely, that before approving a subdivision map local authorities must make specific findings that a subdivision is consistent with the applicable general plan. Plaintiffs emphasize that this principle of law will be applied not only to the instant proposed subdivision but to all future subdivisions and thus that residents of all parts of the city will receive the benefits of plaintiffs' counsel's labor. Plaintiffs urge that, under such circumstances, all of the city's populace may appropriately be required to pay the attorneys fees incurred in securing the *Woodland Hills I* ruling.

Although "it is a built-in consequence of [the Anglo-American principle of] stare decisis that 'a legal doctrine established in a case involving a single litigant characteristically benefits all others similarly situated' " (Dawson, *Public Interest Litigation, supra,* 88 Harv.L.Rev. 848, 918 (quoting *Hoffman* v. *Lehnhausen* (1971) 48 Ill.2d 323, 329-330 [269 N.E.2d 465, 469, 45 A.L.R.3d 1138]), the doctrine of stare decisis has never been viewed as sufficient justification for permitting an attorney to obtain fees from all those who may, in future cases, utilize a precedent he has helped to secure. (See, e.g., *Schleit* v. *British Overseas Airways Corp.* (D.C.Cir. 1969) 410 F.2d 261, 262; *Whittier* v. *Emmet* (D.C.Cir. 1960) 281 F.2d 24, 32.) As the Second Circuit Court of Appeals stated in rejecting a plea for attorney fees based on a comparable theory: "It is a novel assertion that attorneys who are victorious in one case may, like the holder of a copyright, claim fees from all subsequent litigants who might rely on or use it in one way or another." (*Cranston* v. *Hardin* (2d Cir. 1974) 504 F.2d 566, 580.)

Indeed, if plaintiffs' theory of "stare decisis" benefits were accepted, it is not at all clear that *plaintiffs'* counsel should reap the resultant financial rewards, for although the *Woodland Hills I* decision was the first to hold that specific findings are required as to subdivision map approvals, the *Woodland Hills I* court viewed its decision as controlled directly by this court's opinion in *Topanga Assn. For A Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506. Accordingly, under plaintiffs' proposed theory, the attorney who represented the plaintiff in *Topanga* would apparently have at least an equal claim to such fees. These circumstances demonstrate both the impracticality and impropriety of attempting to shift attorney fees to a class of persons who may, under the doctrine of stare decisis, derive future benefits from a general principle of law enunciated in a judicial decision.

Plaintiffs alternatively maintain that the *Woodland Hills I* litigation itself, without regard to stare decisis, provided significant benefits to the general Los Angeles populace by assuring that the particular development at issue in the case was not approved without a specific determination that the subdivision in fact conformed to the applicable general plan. As explained above, however, our decision in *Serrano III* makes it clear that benefits of this nature—which derive primarily from the effectuation of statutory policy—are in themselves insufficient to sustain an attorney fee award under the substantial benefit theory. (20 Cal.3d at p. 42.) This conclusion in no way denigrates the importance or significance of such benefits, but rather simply recognizes that the private attorney general doctrine rather than the substantial benefit theory is the appropriate basis for evaluating attorney fee requests arising from the effectuation of such statutory policies.

We recognize that, in the past, a number of decisions both in California and in other jurisdictions have sustained attorney fee awards pursuant to the substantial benefit theory under circumstances in which the "benefits" conferred by the litigation were arguably no more "concrete" or "actual" than the benefits assertedly bestowed in the instant case. (See, e.g., *Mills* v. *Electric Auto-Lite, supra,* 396 U.S. 375, 389-397 [24 L.Ed.2d 593, 604-609]; *Hall* v. *Cole* (1973) 412 U.S. 1, 4-9 [36 L.Ed.2d 702, 707-710, 93 S.Ct. 1943]; *Coalition for L.A. County etc. Interest* v. *Board of Supervisors* (1977) 76 Cal.App.3d 241 [142 Cal.Rptr. 766].) As subsequent decisions and academic commentaries have pointed out, however, although these decisions formally grounded an attorney fee award upon the "substantial

benefit" rubric, the reasoning of the decisions fits more comfortably into the private attorney general concept than the substantial benefit theory. (See, e.g., *Lee* v. *Southern Home Sites Corp.* (5th Cir. 1971) 444 F.2d 143, 144-145; *La Raza Unida* v. *Volpe, supra,* 57 F.R.D. 94, 98; Dawson, *Public Interest Litigation, supra,* 88 Harv.L.Rev. 849, 866-869; Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 662-664; Note, *Awarding Attorneys Fees to the "Private Attorney General": Judicial Green Light to Private Litigation in the Public Interest, supra,* 24 Hastings L.J. 733, 741.) In the absence of an established, private attorney general rationale, such an expansion of the substantial benefit theory to effectuate important public policies is understandable. Now that the California Legislature has explicitly endorsed the private attorney general theory as a basis for an attorney fee award, however, we believe that in this state cases of this nature should appropriately be governed by the private attorney general doctrine.

Accordingly, on remand, we believe that the trial court should evaluate plaintiffs' request for attorney fees on the basis of the private attorney general concept established by section 1021.5 of the Code of Civil Procedure. Under the facts of this case, an award of attorney fees pursuant to the substantial benefit doctrine would not be appropriate.

*5. Conclusion.*

The trial court denied plaintiffs' motion for attorney fees under the private attorney general doctrine on the premise that that doctrine was not a tenable basis for an attorney fee award in California. As we have seen, while this case was pending on appeal, the Legislature enacted section 1021.5, thereby invalidating the basic premise of the trial court's private attorney general ruling. Because the new legislation applies to all cases, such as the instant matter, pending an appeal when the new statute became effective, we conclude that the trial court's denial of attorney fees must be reversed and the case remanded for reconsideration in light of the new statutory provision.[15]

---

[15]In their petition for hearing in this case, plaintiffs requested that the court award attorney fees for services rendered in connection with this appeal; plaintiffs filed no formal motion to this effect, however, and at that time did not fully brief the issue as to whether attorney fees should appropriately be awarded for time spent in litigating the attorney fee claim. Under these circumstances, we believe that in order to permit all parties to be fully heard on this issue plaintiffs' request for attorney fees on appeal should be remanded to the trial court with directions to hear and determine such motion in conjuction with plaintiffs' original attorney fee request. (See *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 50 [141 Cal.Rptr. 315, 569 P.2d 1303].)

The judgment is reversed and the cause is remanded to the trial court for proceedings consistent with the views expressed in this opinion.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**CLARK, J.**—I concur in the majority's conclusion that Code of Civil Procedure section 1021.5 is applicable to cases pending appeal on its effective date and that the substantial benefits doctrine is not applicable to this case (*pts. 2 and 4 of maj. opn.*). However, I dissent from the majority's statement of facts and their conclusion that the record fails to establish plaintiffs may not recover attorney fees under section 1021.5 (pts. 1 and 3 of maj. opn.).

On 13 June 1972, Consolidated Resources, Inc. filed a tentative tract map with the City of Los Angeles, providing for 123 residential lots on approximately 38 acres. On 31 July the city council adopted preliminary findings in accordance with the advisory agency report that the proposed tract conformed to the general plan and the applicable zoning. (See former Bus. & Prof. Code, § 11526.)[1]

After the preliminary finding, the advisory agency gave notice and held public hearings on the application. The advisory agency approved the tentative tract map subject to 29 conditions providing for numerous improvements, limiting street grades to 15 percent, and requiring dedication of 5.72 acres to the city with improvements for a public park.

While plaintiffs' appeal from the advisory agency determination was pending in the planning commission and prior to hearing, the council formally adopted the Canoga Park-Winnetka-Woodland Hills District Plan as part of the general plan.[2] Among their numerous contentions,

---

[1] At the time of the approval, former Business and Professions Code section 11526, required the "governing body" find that the proposed subdivision is consistent with applicable general or specific plans.

Eleven days after the finding of consistency, former Business and Professions Code section 11526.2 (now Gov. Code, § 66474.60) went into effect as an urgency measure. The section provides: "(a) In cities having a population of more than 2,800,000 [Los Angeles], . . . [¶] (c) The advisory agency, appeal board or legislative body shall not approve a tentative or final subdivision map unless it first finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with applicable general or specific plans."

[2] The district plan had been approved by the council subject to modification on 13 July 1972, a month after Consolidated Resources, Inc., had filed its application and prior to the preliminary finding that the map conformed to the general plan and the zoning requirements.

petitioners argued that the tract map did not conform to the district plan. The planning staff's written recommendation concluded the tract map conformed to the district plan. The planning commission voted two to two on a motion to grant the appeal, and did not make findings. It did not further act within its time limits, and petitioners' appeal was denied by operation of law for failure to take timely action. (Former Bus. & Prof. Code, §§ 11552, 11553; now Gov. Code, §§ 66452.1-66452.5.)

Plaintiffs then appealed to the city council. A motion to grant the appeal on grounds of excessive grading, traffic and density received a seven to seven vote, failing under the charter majority vote requirement. At the council's next meeting a motion to reconsider was defeated six to five. The time for council action expired, and under the statutes the subdivision was "deemed approved." (*Id.*)

The trial court denied mandate concluding that ordinance and statutory provisions plus the tie vote provided an implied finding that the subdivision map was consistent with the general and district plans, and that the implied findings of the appellate administrative bodies were fully supported by the evidence.

Plaintiffs appealed and the Court of Appeal reversed the judgment. The Court of Appeal held that, because the advisory agency, planning commission or city council made no finding that the subdivision complied with the *district* plan, the tie vote did not constitute an approval. The Court of Appeal expressly rejected the trial court's determination of finding by implication. The court reasoned that under *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 125-126 [109 Cal.Rptr. 799, 514 P.2d 111], there must be compliance with ordinances amending permit requirements while administrative appeals are pending and that under *Topanga Assn. For a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 510 et seq. [113 Cal.Rptr. 836, 522 P.2d 12], an express finding of compliance with the district plan is required. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1975) 44 Cal.App.3d 825 [118 Cal.Rptr. 856].)

The narrowness of the Court of Appeal holding is significant and must be pointed out. The city never urged that the subdivision need not comply with the general plan or that a finding of compliance was unnecessary. The city's position was that compliance was accomplished, that a finding of compliance with the original general plan was made, and

that failure to find compliance with the district plan adopted during the pendency of the administrative appeal was not determinative in view of the tie votes and the statutory timely action provisions.

The Court of Appeal remanded the case directing that the superior court return the matter to the city for proceedings in accordance with Business and Professions Code section 11526 (see fn. 1) and as required by *Topanga Assn. For a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506. The court provided that the superior court could determine a motion, if any, for attorney fees on appeal.

On remand the superior court directed that before the city approved the subdivision it was required to find in writing that the subdivision was consistent with the applicable general plan.

Plaintiffs' counsel then sought attorney fees alleging that the residents association did not have sufficient resources or sufficient financial stake in the litigation to enable it to pay for the litigation, and that his law firm had undertaken the case on a pro bono publico basis with the expectation the court would award attorney fees. It was claimed that all city residents would be benefited because henceforth city authorities would comply with the general plan.

Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

Discussing the private attorney general theory for awarding attorney fees, this court in *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 45 [141 Cal.Rptr. 315, 569 P.2d 1303], listed three basic factors used by the courts endorsing such awards: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision."

"It is at once apparent that a consideration of the first factor may in instances present difficulties since it is couched in generic terms, contains no specific objective standards and nevertheless calls for a subjective evaluation by the judge hearing the motion as to whether the litigation before the court has vindicated a public policy sufficiently strong or important to warrant an award of fees. We are aware of the apprehension voiced in some critiques that trial courts, whose function it is to apply existing law, will be thrust into the role of making assessments of the relative strength or weakness of public policies furthered by their decisions and of determining at the same time which public policy should be encouraged by an award of fees, and which not—a role closely approaching that of the legislative function."

With the enactment of section 1021.5, including its provision limiting applicability to enforcement of an "important" right affecting the public interest, the Legislature has thrust upon the courts the obligation to make the ordinarily difficult assessment of the "relative strength or weakness of public policies furthered by their decisions." By the "important" limitation the Legislature has made clear that enforcement of all statutory rights do not warrant attorney fee awards but only enforcement of "important" ones.

While categorization to determine whether a right is "important" will remain a difficult undertaking in many cases, the instant case is not one of them. Rather, it is clear that the purported right vindicated is a technical one. The Court of Appeal determined that, when the general plan is amended by adoption of a district plan during administrative appeals, a finding of conformity with general plan is insufficient, a finding of conformity with the district plan is required, and tie votes by the appellate bodies are insufficient to supply that finding.

Contrary to counsel's extravagant claims, he did not stop Los Angeles practices of failing to require subdivisions to conform to general plans or of failing to make findings. The record belies counsel's claim. In this very case the first finding made was that the subdivision conformed to general plan. And there has been no determination that the subdivision did not conform to the general plan or the district plan. Nor did the city contend at trial or upon appeal that the subdivision need not conform to the general plan.

Apparently recognizing the technical nature of the Court of Appeal's decision, the majority urge that a plaintiff—raising both a technical right and an important right but prevailing only on the technical one—should be permitted attorney fees even though the greater right has never been adjudicated. (*Ante,* pp. 937-939.) The majority rely upon four federal cases. (*Kimbrough* v. *Arkansas Activities Assn.* (8th Cir. 1978) 574 F.2d 423, 426-427; *White* v. *Beal* (E.D.Penn. 1978) 447 F.Supp. 788, 793-794; *Southeast Legal Defense Group* v. *Adams* (D.Ore. 1977) 436 F.Supp. 891, 894-895; *Lund* v. *Affleck* (D.R.I. 1977) 442 F.Supp. 1109, 1112-1114.) The important right assertedly alleged by plaintiffs—not adjudicated by the courts—is that the proposed subdivision does not in fact comply with the district plan. (*Ante,* p. 938.) The main claim of lack of compliance was that the district plan assertedly called for a density of .5 acre per unit whereas the instant subdivision provided for approximately .3 acre per unit.

Had counsel prevailed upon his claim of violation of the general plan, he would not stop the project; he would only succeed in limiting density of the development. Such victories should not be considered vindication of an "important" right within the meaning of the statute.

Moreover, we should reject the majority's theory that a party prevailing upon a technical ground may recover attorney fees if he also alleged violation of an important right. First, the language of the statute is unambiguous requiring "*enforcement* of an important right affecting the public interest." (Italics added.) When the case is decided on the technical ground—leaving the important right unadjudicated—there is no "enforcement of an important right." Secondly, the majority's rule can only frustrate the efficient administration of justice. Having disposed of a case on narrow or technical grounds thereby avoiding determination of substantial claims of important rights, a trial judge in deciding whether to award attorney fees must proceed to rule on each of the potentially numerous causes of action which could be said to involve important rights. The net effect is to require the trial judge to rule on all causes of action while the case might be disposed of by one. And should he rule that attorney fees should be paid because an important right was violated, we may well expect a challenge to the merits on appeal. Often the trial judge's inquiry will frustrate the policy which required him to give judgment for the plaintiff in the first instance. For example, in the instant case the initial determination whether the proposed subdivision violated the district plan is to be made by the city, but under the majority's rule the trial judge, in order to determine whether attorney fees are due, will

be required to examine the evidence and decide the issue. Our courts have more important duties than to engage in complex and lengthy trials in search of a basis for awarding attorney fees.

The four federal cases relied upon by the majority are not in point. In each the plaintiff asserted that a practice violated both constitutional and statutory rights. Determining that the practice violated statutory rights, the courts held that attorney fees were recoverable. The basis of each decision was that clear congressional history showed that attorney fees could be recovered for the violation of a statutory right. We have no such legislative history. More importantly, the attorney fee award in each was based on the statutory right *enforced*—not on the merits of the constitutional claim asserted, and the courts were not required to resolve the constitutional issue.[3]

I would affirm the judgment.

Richardson, J., and Manuel, J., concurred.

---

[3]Although the courts were required to determine that the constitutional claims were not insubstantial. this requirement was jurisdictional. and the determination had to be made before the court could rule on the statutory claim.