Filed 9/27/13  Keener v. Smith CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RODERICK J. KEENER,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TARYN SMITH AS EXECUTIVE OFFICER OF THE STATE BOARD OF OPTOMETRY et al.,<br><br>      Defendants and Respondents. | A129541, A129795<br><br>(Contra Costa County<br>Super. Ct. No. MSN08-1823) |

The State Board of Optometry (the Board) appeals from the trial court's order overturning an administrative law judge's (ALJ) determination that optometrist Dr. Roderick J. Keener (Keener) violated the standard of care by failing to diagnose a patient's cataracts, failing to refer the patient to a physician, and failing to maintain accurate patient records.  In this challenge to both the trial court's granting of a writ of administrative mandate and its award of attorney fees to Keener, the Board contends: (1) the trial court applied the incorrect standard of review in granting Keener's petition for a writ of mandate; (2) substantial evidence does not support the trial court's findings; (3) the trial court erred in awarding attorney fees to Keener under Code of Civil Procedure section 1021.5; and (4) the trial court erred in awarding attorney fees under Government Code section 800.  We agree the trial court erred in awarding attorney fees under Code of Civil Procedure section 1021.5 and Government Code section 800.  We therefore reverse the judgment to the extent it awarded Keener fees.  We reject the Board's remaining contentions and affirm the judgment in all other respects.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Keener graduated from the University of California, Berkeley (UC Berkeley) in 1969 with a bachelor's degree in cellular biology and obtained his doctor of optometry degree from UC Berkeley in 1971. He obtained his certificate of registration to practice optometry on September 22, 1971. From 1971 to 1975, he served as an officer in the Army Medical Service and, since 1975, maintained an optometric practice in Walnut Creek as a sole practitioner. Kenner estimated he had diagnosed over 10,000 cataracts since he began his practice. For over 22 years, Keener was a clinical professor at the School of Optometry at UC Berkeley and taught classes in a variety of subjects, including the diagnosis and treatment of cataracts. He had been an active volunteer in his local public schools for 36 years, where he was a baseball and basketball coach. He also traveled overseas to do volunteer optometric work.

C.S. was a long-time patient of Keener who came under his care in 1981, when she was 31 years old. She had worn contact lenses for many years, and Keener continued to prescribe and dispense contact lenses for her. At some time in the mid - to late-1990's, C.S. became a Christian Scientist. In 2000 or 2001, C.S. refused glaucoma testing because of her religious beliefs but did not refuse slit lamp examinations, which Keener routinely performed on her. In 2004, C.S. noticed her vision had deteriorated. On September 7, 2004, Keener performed a slit lamp examination and noted "lenticular changes." An entry on C.S.'s chart card indicated Keener discussed these changes with her and the chart card included a notation, "Cats? OD > OS," which meant "Cataracts? Right greater than left." On July 19, 2005, C.S. went in to see Keener after noticing she could no longer read highway signs or the words on a television screen. C.S. complained of her vision, but an entry on her chart card showed that C.S. was unsure which contact lens she was wearing. At that time, C.S. was being corrected with monovision, which required her to wear one contact lens in her right eye for distance vision. The chart showed that C.S.'s vision was 20/20 in both eyes in February 1999, 20/20+ in both eyes in January 2002, 20/20- in the right eye and 20/20-3 in the left eye in May 2003, 20/20-

2

in the right eye (left eye not recorded) in September 2004, and 20/30+1 in the right eye and 20/25+2 in the left eye in July 2005.[1]

Keener performed a slit lamp examination on C.S. on July 19, 2005. He wrote on the front side of the chart card, "clr ou," meaning "clear both eyes," and indicated there were no remarkable findings. He did not write anything on the back of the chart card at that time. Keener told C.S. that her vision could have deteriorated due to worsening of her astigmatism, an infection, or age. Keener recommended and dispensed a new contact lens which brought C.S.'s corrected vision to 20/20. He maintained C.S.'s monovision treatment.

C.S. returned to Keener's office ten months later, on May 3, 2006. As measured behind the phoropter,[2] C.S.'s visual acuity in her right eye had dropped to 20/40+ or 20/30– and 20/25+/– in the left eye. The chart card did not contain any entries related to a slit lamp examination but Keener testified he was certain he performed the exam because he prescribed a new gas permeable contact lens, which he would not have done without performing that exam. C.S. saw Keener for the last time on July 14, 2006, when he dispensed the new contact lens. Keener's assistant noted that C.S.'s visual acuity with her contact lens was 20/30–2 with the use of both eyes, and 20/30 for the right eye. The assistant noted these findings on the back of C.S.'s May 3, 2006 chart card.

C.S. felt that her vision was worse with the new lens. She called Keener but he was out of the country at the time so she decided to see another doctor and asked Keener's assistant to fax her records to her. That day, Keener's assistant faxed five pages of records to C.S., which included a copy of the front side of the July 19, 2005 chart card and the front and back sides of the May 3, 2006 chart card.

---

[1]  According to Keener—and undisputed by the Board—a + sign after a number indicates that the patient's vision is better than the number. For example, a vision of 20/40+ means the patient's vision is 20/"better than 40." The patient chart from an August 1, 2005 follow-up appointment showed C.S.'s best corrected vision was 20/20.

[2]  A phoropter is an instrument used to determine a patient's refractive error and prescription. The patient sits behind the phoropter and looks through it. The instrument allows the optometrist to change lenses and obtain the patient's subjective response as to which correction is best.

On August 23, 2006, C.S. saw Stephen C. Puckett, O.D., F.A.A.O. (Puckett), who found that C.S.'s visual acuity was 20/50 in the right eye and 20/60 in the left eye. Puckett examined C.S. with the slit lamp and saw cataracts in both eyes, the right greater than the left. He described the cataracts as 2+, a subjective grade that describes moderate cataracts, and determined they "corresponded with her loss of visual acuity." Puckett diagnosed nuclear and cortical cataracts, which are cataracts that develop slowly and gradually "over years." Puckett referred C.S. to ophthalmologist John Frederick Riedel, M.D. (Riedel), for a full examination.

When Riedel saw C.S. within a week of her appointment with Puckett, Riedel's technician measured C.S.'s visual acuity at 20/100. Riedel dilated C.S.'s eyes and observed cataracts in both eyes, the right greater than the left. He graded the cataracts as 2+ and opined that the cataracts were the reason for C.S.'s symptoms and vision loss. Riedel also found that the cataracts were slow-developing cataracts. Riedel recommended surgery.

In a preoperative examination on October 13, 2006, Hung Pham, M.D. (Pham), rated the cataracts in C.S.'s right eye as 3+ and in her left eye as 2+. He measured C.S.'s visual acuity as 20/50 in the right eye and 20/60 in the left eye. Pham operated on the right eye in October 2006 and on the left eye in December 2006. C.S.'s vision after the surgeries was 20/20.

At some time after her first appointment with Puckett, and before October 25, 2006, C.S. called Keener's office and informed the receptionist that she had cataracts and was planning to file a complaint with the Board. C.S. filed the complaint on October 25, 2006, and also filed an action against Keener in small claims court seeking $1,540, the amount she had paid him for treatment between 2004 and 2006.

On or about June 15, 2007, the Board filed an accusation against Keener to revoke his optometric certificate. This was the first complaint Keener had ever received since obtaining his certificate in 1971. The accusation alleged a first cause of action for repeated negligent acts, a second cause of action for professional incompetence, a third cause of action for failure to refer, and a fourth cause of action for unprofessional

4

conduct.  It alleged that Keener:  (1) "failed to perform and/or document clinical measurements and procedures or document his attempts to perform such measurements and procedures after an informed explanation, relevant to determining the cause of the patient's complaint of reduced vision, and failed to indicate clinical impressions and treatment plan"; (2) "improperly assumed that the patient would refuse all eye health testing, based on her Christian Science beliefs, and failed to provide and document that an informed explanation was offered and the patient refused eye health testing after said explanation; (3) failed to attempt to rule out the possibility of cataracts during examinations . . . on July 19, 2005, and May 3, 2006"; (4) "improperly withheld communication of his examination findings from the patient, with regard to the worsening condition of her vision"; (5) "failed to refer the patient to an appropriate physician, despite the fact that examinations of July 19, 2005 and May 3, 2006, indicated a substantial likelihood of pathology requiring the attention of a physician."  The Board requested that a hearing be held and that a decision be issued revoking or suspending Keener's license and ordering him to pay the Board the reasonable costs of the investigation and enforcement in this case.

Keener, C.S., Keener's assistant Karen Fryer, optometrist Brian Chou, O.D., F.A.A.O. (Chou), optometrist Lawrence S. Thal, O.D., M.B.A., F.A.A.O. (Thal), optometrist Puckett, ophthalmologist Todd Dana Severin, M.D. (Severin), and ophthamologist and surgeon Riedel all testified at a hearing held before the ALJ.  In his proposed decision, the ALJ stated that on July 19, 2005, and May 3, 2006, the standard of care for a reasonably prudent practitioner was to determine the underlying cause of C.S.'s symptoms and vision loss.  In the opinion of Chou, Keener breached that standard by failing to diagnose cataracts.  Chou testified that C.S.'s symptoms and the drop in visual acuity in her right eye from 20/20 in 2004 to 20/30+ in 2005 were "highly suspicious for cataracts in a patient over 50."  He believed C.S.'s cataracts, "which were of the type that develop slowly and gradually over months to years," were present in 2005 and 2006 and that Keener breached the standard of care by failing to diagnose them.  Thal and Severin opined, as experts for Keener, that Keener did not breach the standard of care because

5

C.S.'s cataracts were fast-growing cataracts that were not present when Keener examined her in 2005 and 2006. These experts noted that the fact that C.S.'s vision in her right eye deteriorated quickly—from 20/30-2 on July 14, 2006, at Keener's office, to 20/50 on August 23, 2006, at Puckett's office, to 20/100 a week later at Riedel's office—showed that C.S. had fast-growing cataracts. Thal also noted that the grading of C.S.'s lenses, from Keener's finding of 0+/1- to the findings of 2+ by Puckett and Riedel, to the pre-surgery finding of 3+/2+ by Pham showed the cataracts were fast growing. The ALJ found that "measurements of a patient's visual acuity, particularly a patient like C.S. who is highly myopic with a high degree of astigmatism, can vary significantly from one examiner and one examination to another" due to such things as poorly fitting contact lenses or the patient's head position behind the phoropter, and that such changes in measured visual acuity "do not necessarily indicate a rapidly growing cataract." The ALJ also found that the assessments of C.S.'s lenses were "subjective" and that the evidence failed to establish that there was any material difference between the 2+ assessments of Puckett and Riedel and the 3+/2+ assessment of Pham. The ALJ also found that the 0+/1- grade that Keener gave as of July 19, 2005 was not "trustworthy" because he made that entry on C.S.'s chart at some point after he examined her on July 19, 2005, and the grade was inconsistent with his contemporaneous finding on that date that C.S.'s lenses were clear in both eyes.

The ALJ further found that Keener breached the standard of care by failing to refer C.S. to a physician. The ALJ noted that all three experts had agreed that the standard of care requires referral for cataracts when the patient's best corrected vision is 20/40 or worse. The ALJ found that Keener should have referred C.S. to a physician despite the fact that C.S.'s best corrected vision was never at the threshold level of 20/40 or worse at any time during the years he treated her. In making that finding, the ALJ relied on Chou's opinion that an optometrist must "consider the patient's functional vision" in addition to her measured visual acuity, because "some patients are highly symptomatic even though their corrected vision is 'pretty good.'"

6

The ALJ further found that Keener's entries on the back of the July 19, 2005 chart card were inaccurate or inadequate. Noting that the standards of practice requires an optometrist to state the month, date, and year on which addenda are made to a patient chart and to sign or initial any changes, the ALJ found that Keener had stated only the month and year—"7/05"—in which the changes were made, and did not sign or initial the changes. The ALJ also noted that the entries on the back of the card stated that C.S. was refusing "eye health testing, dilation and ocular surgery," despite the fact that the front of the card stated that Keener examined C.S. with the ophthalmoscope, slit lamp, and tonometer, which were all forms of eye health testing. The ALJ also did not believe C.S. had refused dilation because she testified that Keener never asked to dilate her eyes at any appointment, and because that testimony was undisputed. Finally, the ALJ noted that the back of the chart card noted a "slight haze" in C.S.'s lenses upon slit lamp examination, while the front of the card stated, "clear both eyes" and "no remarkable findings," which further rendered the chart card unreliable.

The ALJ found the Board had shown by clear and convincing evidence that disciplinary action should be taken against Keener for his failure to diagnose cataracts and refer C.S. to a physician, and for his failure to maintain adequate and accurate records relating to C.S. The ALJ noted that Keener had "successfully treated thousands of patients in the course of his career, including 10,000 patients with cataracts, without a single prior complaint," and found that in light of Keener's "unblemished career as a practitioner, to say nothing of his academic career," his failure to diagnose C.S.'s cataracts was an event that was unlikely to occur again. He found, however, that Keener's negligent treatment of C.S. and his failure to maintain accurate records was a "serious matter" that required that his license be revoked, with revocation stayed, and that he be placed on probation for three years. The ALJ further found that "[c]ause exists to order [Keener] to pay" to the Board the reasonable costs of investigation and enforcement in the amount of $24,291.75. The ALJ's proposed decision was adopted as the final decision effective October 3, 2008.

7

On November 3, 2008, Keener filed a petition for a writ of administrative mandate requesting that the trial court reverse the findings of the ALJ.  The trial court granted the petition in an order filed February 8, 2010.  Noting that the proper standard of review to be applied in the case is the "Independent Judgment Rule," the court found that "the evidence on which the ALJ based his findings and conclusions were insufficient to establish breach of the standard of care ('ordinary' negligence) required of optometrists (and all health care providers), much less the higher standard required to establish negligence by 'clear and convincing evidence,' the burden of proof required in the proceeding before him."  The court found that Chou's testimony was unreliable because the record showed that Chou:  (1) did not review C.S.'s entire patient record and/or failed to correctly interpret the entries; (2) misinterpreted or failed to consider entries in the records relating to the fact that Keener  performed slit lamp and other examinations to evaluate C.S.'s eyes, as well as Keener's findings from those examinations; (3) expressed opinions giving more weight to C.S.'s subjective complaints rather than the objective entries in the records; (4) reached erroneous conclusions based on the above; and (5) "[u]sed an improper basis (hindsight) for concluding that Dr. Keener breached the standard of care," based on "subsequent findings of Drs. Puckett and Reidel in late August 2006," rather than based on what Keener should have done at the time he made his decisions in treating C.S.  The court also noted that Chou's testimony was "largely conclusory and lacking in specific facts as to how he reached his conclusions."

The court noted that Keener's records relating to C.S. "stand uncontradicted that the patient's best corrected visual acuity was never worse than 20/25+.  All experts—John Reidel, M.D., Todd Severin, M.D., Dr. Lawrence Thal, Dr. Stephen Puckett, including Dr. Brian Chou—testified that the standard of care did not require referral to an ophthalmologist unless the patient's best corrected visual acuity was worse than 20/40. [¶] The rationale as explained by Ophthalmologist Dr. Todd Severin is that a patient is not a candidate for cataract surgery unless the patient's best corrected visual acuity is worse than 20/40, because the **risk** that the patient's vision could end up being 20/50 or 20/60 as a sequelae of the surgery, outweighs the **potential benefit**."  The court pointed

out, "Dr. Chou testified that since [C.S.'s] best corrected visual acuity was 20/50 on August 23, 2006 when she was examined by Dr. Puckett and 20/100 on August 30, 2006 when she was seen by Dr. Reidel and cataracts were determined to be the cause of the deterioration in her vision, applying '**hindsight**,' her vision must have been worse than determined by Dr. Keener on July 14, 2006.  (Fn. omitted.)  Dr. Reidel testified that there was no way to know how long the cataracts had been present or how rapidly they had grown and that [C.S.] was referred to him by Dr. Puckett because he was unable to correct her vision to better than 20/50-20/60."

The court further found, "The weight of the evidence is that the cataracts grew rapidly in [three] months—Drs. Severin and Thal testified that Dr. Keener complied with the standard of care in all respects, that cataracts can grow rapidly and that based on reasonable medical probability her cataracts did grow rapidly since there was no other cause for her decrease in visual acuity from May to August 2006.  Further, there was no way for Dr. Keener to predict that the decline in the patient's vision would occur within the next [three] months as it did.  In addition, since opacity of the lens increased from NS1 to NS3 in . . . that same period of time, coupled with rapidly changing visual acuity, leads to [the] conclusion that the cataracts were rapidly growing.  In short, the standard of care did not require that Dr. Keener refer the patient for evaluation."  The court relied in part on Dr. Thal's opinion that "[t]he objective of optometry is to correct the patient's vision for as long as possible before surgery is undertaken, and that patients aren't referred to an ophthalmologist unless **four conditions** are met, assuming the optometrist has used a biomicroscope and considered possible causes relating to the patient's complaints, which in this case 'it is very clear that he (Dr. Keener) did:' [¶] 1.  There has to be a visually significant cataract, which does not appear to have been the case here. [¶] 2.  There has to be a loss of visual acuity caused by cataracts that cannot be corrected, which in this case the vision was able to be corrected (to greater than 20/40) and was, therefore, not the result of changes in the lens. [¶] 3.  Even if there is a small cataract with some loss of visual acuity, unless there is significant loss of visual acuity, no referral is required. [¶] 4.  Because of the risks that the vision could be worse after cataract surgery

9

(20/50 or 20/60), patients whose vision is better than 20/40 are not considered candidates for cataract surgery."

As to the record keeping issue, the court found, "there does not appear to be a standard of care requirement." The court noted that although Chou testified he was " 'concerned' . . . that Dr. Keener made addendum entries on a 'couple' of pages and did not date and initial them, . . . it was 'perfectly acceptable for a practitioner to make an addition.' " The court also noted that Dr. Thal testified that the records were adequately maintained. The court ordered that Keener "shall recover his costs and attorney's fees in defending the underlying accusation and in pursuing the Petition for Writ," and ordered Keener's attorney to file a declaration delineating the amount of fees and costs he seeks to recover.

The Board filed objections to the order granting the petition for a writ of mandate. Keener filed a response to the objections. On July 1, 2010, the trial court issued an order affirming its prior order granting the petition for a writ of mandate. On August 26, 2010, after the parties submitted briefing on the issue of attorney fees, the court issued an order awarding Keener $79,801 in attorney fees and $1,922.30 in costs. The court found, "[t]he action by the Board and the Attorney General was not only clearly erroneous, but also was arbitrary and capricious. The Board and attorney appear to have accepted the statements of the patient and opinions of Dr. Chou without objectively and independently evaluating the logic of those statements and opinions and Dr. Chou's erroneous interpretations of and/or failure to obtain and evaluate complete records. Based on those facts, and apparently by excluding any exculpatory evidence from their analysis, they not only filed the accusation, but pursued it through administrative hearing. [¶] The Board and attorney incorrectly analyzed, applied, used, and argued the applicable law in determining standard of care (much less by clear and convincing evidence) as pointed out in this Court's Order Granting Writ of Mandate." The court further found, "Moreover, instead of evaluating the conduct of Dr. Keener based on the evidence available to Dr. Keener at the time he evaluated the patient, they used hindsight and subjectivity in contravention of legal authority. Their overall conduct is particularly egregious

10

considering that the patient was not injured as the result of Dr. Keener's care and treatment of her."

Additionally, "[t]he Court further [found] that the fees and costs awarded . . . are recoverable under the 'private attorney general doctrine' as codified under [Code of Civil Procedure s]ection 1021.5.  The Court [found] that this proceeding resulted in the enforcement of important rights affecting the public interest including, but not limited to, the preservation of the proper standard of review of ALJ decisions at the trial court level, the preservation of the proper standards for reviewing the actions of medical providers and/or determining whether a medical provider committed an act of negligence, the preservation of the [existing] standard for when an optometrist is required to refer a patient for cataract surgery referrals."  The Board filed a notice of appeal on August 26, 2010.[3]

**DISCUSSION**

*1. Standard of review*

The Board contends the trial court applied the incorrect standard of review in granting Keener's petition for a writ of mandate.  We disagree.

Code of Civil Procedure section 1094.5 provides that a trial court shall exercise its independent judgment when reviewing the decision of an administrative agency, and that an "abuse of discretion is established if the [trial] court determines that the [administrative agency's] findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c).)  Although the trial court is required to exercise its independent judgment on the evidence, it is to give a "strong presumption of correctness" to the Commission's findings.  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).) In a proceeding on a writ of administrative mandate, "the party challenging the administrative decision bears the burden of convincing the court that the administrative

---

[3]  We granted the California Optometric Association's "application for leave to file an amicus curiae brief on the issue of the optometrist's duty to refer a patient for cataract surgery."

11

findings are contrary to the weight of the evidence." (*Id.* at p. 817; see also *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077 ["In the trial court, the [petitioners] had the burden of proof to show that the [agency's] decision was not supported by the weight of the evidence—that is, that the decision was not supported by the preponderance of the evidence"].)  Independent judgment review " 'does not mean that the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort. . . .  [I]n weighing the evidence the courts can and should be assisted by the findings of the board.' " (*Fukuda*, *supra*, at p. 812.)

The presumption of correctness, however, is not the same as substantial evidence review and does not relieve the trial court of the obligation to make its own findings. "[T]he presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome.  Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings. . . .  [T]here is no inconsistency in a rule requiring that a trial court begin its review with a presumption of the correctness of administrative findings, and then, after affording the respect due to these findings, exercise independent judgment in making its own findings." (*Fukuda*, *supra*, 20 Cal.4th at pp. 818-819.)  " '[U]nder the independent judgment rule, the trial court must weigh the evidence and make its own determination as to whether the administrative findings are sustained.' [Citation.]" (*Yordamlis v. Zolin* (1992) 11 Cal.App.4th 655, 659.)  The trial court may also weigh the credibility of witnesses.  (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461.)  "The trial court has ' " ' "the ultimate power of decision" . . . .' " ' " (*Yordamlis v. Zolin*, *supra*, 11 Cal.App.4th at p. 659.)

Here, the parties agree the trial court was correct in stating it was going to apply the "Independent Judgment Rule" in reviewing the ALJ's findings.  The Board, however, asserts the trial court misapplied the rule because the court did not presume—as it was required to—that the ALJ's decision was correct, and because it "imposed the wrong burden of proof on the wrong party."  In support of its position, the Board relies on

statements the trial court made that purportedly show the court misunderstood its role. For example, the Board points out that the trial court stated it was going to determine "whether or not the evidence supports the findings and conclusions of the [ALJ] by 'clear and convincing evidence.' " The Board also notes that the trial court stated at the hearing on the petition, "Tell me what the clear and convincing evidence is . . . ." Finally, the Board points to the court's statement, "In this case, to sustain their burden of proof, [the Board] must have proven at least two acts of breach of the standard of care by clear and convincing evidence. They failed in that endeavor."

None of the above statements, however, show the trial court misunderstood its role. Rather, they show the court was aware that the Board had the burden *at the administrative level* of proving its case by clear and convincing evidence. (See *Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856 ["The proper standard of proof in an administrative hearing to revoke or suspend a doctor's license should be clear and convincing proof to a reasonable certainty and not a mere preponderance of the evidence"].) The trial court did not state at any time that the Board had the burden to prove its case *to the trial court*, or that it had to do so by clear and convincing evidence. In fact, the court specifically stated in its written order that "the evidence on which the ALJ based his findings and conclusions were insufficient to establish breach of the standard of care ('ordinary' negligence) . . . much less the higher standard required to establish negligence by 'clear and convincing evidence,' *the burden of proof required in the proceeding before him*." (Italics added.) Moreover, the trial court did not state at any time that it was refusing to presume the ALJ's findings were correct. Rather, the record supports the conclusion that the court, while acknowledging the ALJ's findings, disagreed with them after reviewing the entire record and evaluating how the ALJ reached his decision.

### 2. Substantial evidence

The Board contends there is no substantial evidence supporting the trial court's findings. We disagree.

" 'After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited.' [Citation.]" (*San Diego Unified School Dist. v. Commission on Professional Competence*, *supra*, 194 Cal.App.4th at p. 1461.) In such cases, the trial court's determination " ' " 'is given the same effect as any other judgment after trial rendered by the court: the only question is whether the trial court's (not the administrative agency's) findings are supported by substantial evidence. . . . Conflicts in the evidence must be resolved in favor of the judgment and where two or more inferences can be reasonably drawn from the facts, the reviewing court must accept the inferences deduced by the trial court.' . . . [¶] 'Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value.' . . . Additionally, a reviewing court 'may look to the findings in [the administrative agency's] decision for guidance in determining whether the trial court's judgment is supported by substantial evidence.' . . ." ' " (*Sandarg v. Dental Bd. of California* (2010) 184 Cal.App.4th 1434, 1440, citations omitted.)

Business and Professions Code section 3110 provides that the Board "may take action against any licensee who is charged with unprofessional conduct, and may deny an application for a license if the applicant has committed unprofessional conduct." The section defines unprofessional conduct as, among other things, improper advertising (Bus. & Prof. Code, § 3110, subd. (g)), criminal convictions (*id.,* subd. (k)), substance abuse (*id.,* subd. (l)), or, as relevant here, "[r]epeated negligent acts," i.e., "two or more negligent acts or omissions" (*id.,* subd. (c)), failure to maintain adequate and accurate patient records (*id.,* subd. (q)), and failure to refer to a physician (*id.,* subd. (y)).

Here, all of the experts agreed that the standard of care requires referral to an ophthalmologist when a patient's best corrected visual acuity is 20/40 or worse. It was also undisputed that C.S.'s best corrected visual acuity was never 20/40 or worse. Although Keener suspected in 2004 that C.S. might have cataracts and there was some deterioration in C.S.'s vision when he saw her in July 2005, he was able to correct her vision to 20/20, and C.S. said her vision was "now excellent" as of August 1, 2005. On May 3, 2006, the date of C.S.'s last eye examination with Keener, C.S. complained of

14

poor vision but Keener dispensed a new contact lens and her best corrected vision was 20/25+.  Thus, there was little—if any—objective evidence requiring Keener to refer C.S. to a physician for cataract surgery at any time while she was under his care.  Although Chou testified that an optometrist must "consider the patient's functional vision" in addition to what her measured visual acuity is, he also acknowledged that if a patient "was correctable to 25 plus 1 and had some slight haze visible through the biomicroscope," "[t]he overwhelming majority of practitioners would not refer such a patient for cataract surgery."  Riedel, an ophthalmologist who performs cataract surgeries and examined C.S., agreed, testifying that if a patient's vision can be corrected to better than 20/40, "generally, we don't see [such patients]."  Thal added that it is an "objective of optometry to correct the patient's vision for as long as possible before undergoing a surgery."

The trial court also reasonably determined that the "weight of [the] evidence" did not support the ALJ's finding that Keener breached the standard of care by failing to diagnose cataracts.  The court noted that the ALJ relied primarily on the testimony of Chou, whose opinion the court found unreliable because it was "largely conclusory," and because Chou, among other things, failed to review C.S.'s entire patient record, misinterpreted or failed to consider entries in the records relating to the fact that Keener performed various examinations to evaluate C.S.'s eyes, expressed opinions giving more weight to C.S.'s subjective complaints rather than the objective entries, and "[u]sed an improper basis (hindsight)" in reaching his conclusions.  The court further found that "[t]he weight of [the] evidence is that the cataracts grew rapidly in [three] months" and that there was therefore "no way for Dr. Keener to predict that the decline in the patient's vision would occur within the next [three] months as it did."[4]  There was evidence to support those findings of the trial court, as C.S.'s vision deteriorated quickly, i.e., her

_____

[4]  Riedel testified that, while he observed cataracts when he saw C.S. on August 29, 2006, there was "no objective way" for him to determine how long before that visit C.S. had been symptomatic with cataracts, i.e., there was no way he could say with certainty that Keener should have seen the cataracts when he examined C.S. in May 2006.

visual acuity went from 20/25+ when she last saw Keener in May 2006, to 20/50 on August 23, 2006, at Puckett's office, to 20/100 a week later at Riedel's office, and the grading of her lenses went from Keener's finding of 0+/1-, to the findings of 2+ by Puckett and Riedel, to the presurgery finding of 3+/2+ by Pham.

Finally, there was substantial evidence supporting the trial court's finding that Keener did not engage in "unprofessional conduct" in his maintenance of patient records. Thal, who had many years of experience reviewing optometrist records—both at the university where he worked, and as a Board member for nine years—opined that Keener's records were not inadequate in any way. He gave examples of the types of inadequate records that warranted discipline, and noted that while it is always possible to find ways in which records can be more complete or legible, this was not "to say in any way [that Keener's] records are inappropriate." Further, as the trial court noted, although Chou testified that he was "concerned" about some inconsistencies and about the fact that Keener did not sign or fully date addendum entries on a "couple" of pages, the Board did not adequately articulate a standard of care requirement or provide authority to support its position that such inconsistencies or omissions warranted discipline.

### 3. Private attorney general fees

The Board contends the trial court erred in awarding attorney fees to Keener under Code of Civil Procedure section 1021.5 (section 1021.5). We agree.

Section 1021.5 permits an award of attorney fees to a successful party in an action that "has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

The statute, which is a codification of the "private attorney general" doctrine, recognizes that "privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that,

16

without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 (*Woodland Hills*); see also *Bell v. Vista Unified School Dist*. (2000) 82 Cal.App.4th 672, 690 [private attorney general doctrine is designed to "encourage private enforcement of important public rights and to ensure aggrieved citizens have access to the judicial process where statutory or constitutional rights have been violated"].) Accordingly, "private attorney general" fees may be awarded when the plaintiff's action "(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter." (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142; *Press v. Lucky Stores, Inc*. (1983) 34 Cal.3d 311, 318.)

Trial court decisions on attorney-fee requests under section 1021.5 have traditionally been reviewed deferentially and upheld absent a prejudicial abuse of discretion. (See, e.g., *Baggett v. Gates*, *supra*, 32 Cal.3d at pp. 142-143; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1125.) Our Supreme Court recently clarified, however, that the proper standard of review depends on the extent to which there were issues of fact below. If the issue is whether the criteria for an award of attorney fees and costs in this context have been satisfied, "this may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review." (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) If, on the other hand, the underlying facts are largely undisputed and the issue calls for statutory construction, it is a question of law that is reviewed de novo. (*Id*. at pp. 1175-1176.)

Here, the application of section 1021.5 involves mixed questions of law and fact. However, even giving deference to the trial court's exercise of discretion and drawing reasonable inferences in favor of its ruling, we cannot uphold the trial court's decision.

17

### a. Important right

The first prong of the section 1021.5 test for "private attorney general" fees requires a determination of "the 'strength' or 'societal importance' of the right involved." (*Woodland Hills*, *supra*, 23 Cal.3d at p. 935; *Roybal v. Governing Bd. of Salinas City Elementary School Dist.* (2008) 159 Cal.App.4th 1143, 1148.) That right may be constitutional or statutory, but it must be "an important right affecting the public interest"—it "cannot involve trivial or peripheral public policies." (*Woodland Hills*, at p. 935; *Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044.)

Here, as noted, the trial court awarded section 1021.5 fees on the ground that Keener's action ensured "the preservation of the proper standard of review of ALJ decisions at the trial court level, the preservation of the proper standards for reviewing the actions of medical providers and/or determining whether a medical provider committed an act of negligence, the preservation of the [existing] standard for when an optometrist is required to refer a patient for cataract surgery referrals." Keener's petition, however, was based primarily on a failure of proof in his particular case, i.e., that there was insufficient evidence to support the ALJ's findings that he breached the standard of care in his treatment of one of his patients. At best, Keener's victory revealed some deficiencies in the Board's way of pursuing an accusation against a licensee based on limited evidence. The remediation of that defect did vindicate Keener's personal right to maintain his optometric certificate, but did not amount to enforcement of an important right for the general public.

### b. Significant benefit

Even assuming Keener obtained enforcement of an important right, we cannot agree that substantial benefit inured to the public or a large class of licensed professionals. Keener suggests that a significant benefit was conferred on all licensed professionals, who will benefit from his successful efforts to ensure that "the proper standard of care for the entire Optometry industry" is preserved. The writ of mandate, however, directly benefited only Keener, as he secured a ruling for himself that there was insufficient evidence to revoke his license under the circumstances of his case. No other

18

licensees were named in the order, nor was the language issued relevant to other licensees.

"Of course, the public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified. Both the statutory language ('significant benefit') and prior case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation." (*Woodland Hills*, *supra*, 23 Cal.3d at p. 939.) Rather, the significance of the benefit achieved by the successful party must be determined "from a realistic assessment, in light of all the pertinent circumstances, of the gains [that] have resulted in a particular case." (*Id*. at p. 940; *Family Planning Specialists Medical Group, Inc. v. Powers* (1995) 39 Cal.App.4th 1561, 1568-1569.)

Realistically assessed, the gains achieved by Keener were personal. The writ of mandate did not vindicate the rights of "all licensees throughout the State of California," and any benefit to the public in the preservation of the proper standard of care was incidental to the primary goal of the lawsuit—to restore Keener's license and vindicate his rights. (Cf. *Bell v. Vista Unified School Dist*., *supra*, 82 Cal.App.4th at p. 691 [even if significant public benefit resulted, primary focus was wrongful termination and quest for damages].) Thus, we cannot find a reasonable basis to conclude that a significant benefit was conferred on the public or a large class of persons.

### c. Necessity and financial burden

Although the insufficiency of the "significant benefit" requirement alone defeats the claim for section 1021.5 fees, we briefly comment on the third prong of the "private attorney general" test as it applies here. This element is met if the cost of the claimant's legal victory transcends his personal interest—that is, when the burden of the litigation was disproportionate to the claimant's individual stake in the matter. (*Woodland Hills*, *supra*, 23 Cal.3d at p. 941.) "Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." (*Beach Colony II v. California Coastal Com*. (1985) 166 Cal.App.3d

19

106, 114; *People ex rel. Brown v. Tehama County Bd. of Supervisors* (2007) 149 Cal.App.4th 422, 454 [section 1021.5 fees serve " 'as a "bounty" for pursuing public interest litigation, not a reward for litigants motivated by their own interests who coincidentally serve the public' . . . "].) Thus, "[i]f the enforcement of the public interest is merely 'coincidental to the attainment of . . . personal goals' [citation] or is 'self-serving' [citation], then this requirement is not met." (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 750-751.)

Keener asserts he did not have much to gain in pursuing this action because he was permitted to practice optometry while on probation, and "could have [continued to do so] without ever filing the Writ or challenging the ALJ Decision. In other words, there was no monetary 'need' or possible gain for Dr. Keener in filing the writ. To the contrary, every cent he has spent . . . has been to preserve the proper standard of care for all optometrists in addition to himself." While it may be true that the outcome of the petition did not have a significant economic impact on Keener, economic recovery is not the sole measure of necessity and financial burden of the litigation. To the contrary, there may be "nonfinancial personal interests of sufficient strength and specificity to prompt an individual to pursue vigorously a suit notwithstanding a substantial financial burden in doing so." (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 514, disapproved on another ground in Conservatorship of Whitley (2010) 50 Cal.4th 1206, 1226, fn. 4; see also *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, 181 [personal stake may consist of aesthetic, environmental, property, or other concrete, nonfinancial interests].) Here, Keener had a significant interest in clearing his name and having the ALJ's findings against him overturned. The financial burden of the litigation did not transcend Keener's personal interest in obtaining that reversal; section 1021.5 attorney fees were not warranted.

### 4. Government Code section 800 fees

Government Code section 800, subdivision (a), provides in part: "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law, . . . if

it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity, the complainant if he or she prevails in the civil action may collect from the public entity reasonable attorney's fees, computed at one hundred dollars ($100) per hour, but not to exceed seven thousand five hundred dollars ($7,500), if he or she is personally obligated to pay the fees in addition to any other relief granted or other costs awarded."  Arbitrary and capricious conduct includes " 'conduct not supported by a fair or substantial reason [citation], a stubborn insistence on following unauthorized conduct [citation], or a bad faith legal dispute [citation].' " (*Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 79; *Reis v. Biggs Unified School Dist.* (2005) 126 Cal.App.4th 809, 823.)  " ' "Attorney's fees may not be awarded [under the section] simply because the administrative entity or official's action was erroneous, even if it was 'clearly erroneous.' " ' [Citation.]" (*Reis v. Biggs Unified School Dist.*, *supra*, at p. 823.)  Whether conduct was arbitrary and capricious is a question of fact within the sound discretion of the trial court.  (*Ibid.*)

The Board contends the trial court erred in awarding attorney fees under Government Code section 800.  We agree.  In awarding fees to Keener under this section, the trial court stated, "The Board and attorney appear to have accepted the statements of the patient and opinions of Dr. Chou without objectively and independently evaluating the logic of those statements and opinions and Dr. Chou's erroneous interpretations of and/or failure to obtain and evaluate complete records.  Based on those facts, and apparently by excluding any exculpatory evidence from their analysis, they not only filed the accusation, but pursued it through administrative hearing."  Although the trial court made some valid points, the record as a whole does not support the court's finding that the Board acted arbitrarily or capriciously.  Even accepting the trial court's finding that Chou's testimony was not reliable, or that the evidence against Keener was slim, we note that the Board, at the very least, had *some* evidence on which it relied in pursuing the accusation, e.g., C.S.'s complaints about her vision deteriorating, which the ALJ apparently found credible, and the testimony of two physicians that the cataracts were

21

slow-growing, which could have supported a finding that the cataracts must have been significant enough when Keener last examined C.S. that he should have referred her to a physician at that time. Moreover, an ALJ found, after reviewing the record and presiding over a full administrative hearing, that there was sufficient evidence to support the Board's accusation and found in it favor. Under these circumstances, we cannot uphold the trial court's determination that the Board acted arbitrarily and capriciously in pursuing the accusation.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The parties shall bear their own costs on appeal.


_____
McGuiness, P. J.


We concur:


_____
Pollak, J.


_____
Jenkins, J.